UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL S. HOLMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:14-CV-75-CEJ |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On May 12, 2011, plaintiff Michael S. Holmes filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of April 23, 2011. (Tr. 178–89)  After plaintiff's application was denied on initial consideration (Tr. 125–29), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 59–60, 133)  Plaintiff and counsel appeared for a hearing on March 14, 2013. (Tr. 71–115)  The ALJ issued a decision denying plaintiff's application on April 4, 2013. (Tr. 17–35)  Plaintiff requested the Appeals Council reverse the ALJ's decision and remand for a new hearing. (Tr. 9)  The Appeals Council denied plaintiff's request for review on June 24, 2014. (Tr. 1–4) Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

Plaintiff was born on September 12, 1963. (Tr. 116) He is unmarried and has no dependents. (Tr. 185) In his Disability Report (Tr. 218–24), plaintiff stated that he last worked on April 23, 2011, his alleged onset date. Plaintiff stated that he quit his position as a clerk and phone receptionist at a Wal-Mart store on that date "because of his conditions." (Tr. 219–20, 242) He also reported that his medical conditions did not cause him to make any changes in his job duties. (Tr. 220) His other past relevant work included working at Wal-Mart as a fitting room clerk and as a general laborer in a trucking warehouse. (Tr. 220, 242, 273)

Plaintiff did not provide any information about the number of hours each day he walked, stood, sat, climbed, reached, wrote, typed, or handled large or small objects in any of those jobs. (Tr. 221) He also did not answer questions about his ability to lift and carry or about the heaviest weight he was able to lift. In a Work History Report completed on June 20, 2011, plaintiff wrote that when he worked as a general laborer he loaded and unloaded trucks, that once a year he lifted boxes weighing 15 pounds, and that he frequently lifted items weighing less than ten pounds. (Tr. 221, 243) He had restrictions on bending, twisting, climbing; he was permitted to sit or stand "as comfort dictate[d]." (Tr. 244) Plaintiff also supervised a team of three people when he worked at Wal-Mart. (Tr. 243) Though he indicated that some of the information on his Work History Report was incorrect, he completed the form himself, did not correct his own errors, and did not indicate which information was incorrect. (Tr. 253)

In his disability application, plaintiff listed his disabling conditions as herniated discs, "fusion problems," heart conditions, and pancreatitis. (Tr. 219) He complained of "bad" back pain and "bad" pancreatitis. (Tr. 256) He also suffers

from acid reflux, high blood pressure, arrhythmia, and depression. (Tr. 257) He reported taking the following medications for his conditions: aspirin, Coumadin,[1] Flexeril,[2] Lanoxin (which is Digoxin),[3] Lopressor,[4] Prilosec,[5] Vicoprofen,[6] Zestril,[7] and Zoloft.[8] (Tr. 222, 258, 275, 277) Though plaintiff sought medical assistance for his physical conditions, he did not report receiving any psychological counseling, and no records of any such care were presented for review before the ALJ or here on appeal. (Tr. 221–23)

In a Function Report (Tr. 228–38), plaintiff stated that he lived in an apartment with his girlfriend. (Tr. 228) His daily activities included taking his medications, eating breakfast, taking "a little walk," showering, and "clean[ing] up."

---

[1] Coumadin is a brand name for Warfarin. It is used to prevent blood clots from forming or growing larger in the blood and blood vessels. "It is prescribed for people with certain types of irregular heartbeat, people with prosthetic (replacement or mechanical) heart valves, and people who have suffered a heart attack. Warfarin is also used to treat or prevent venous thrombosis (swelling and blood clot in a vein) and pulmonary embolism (a blood clot in the lung). Warfarin is in a class of medications called anticoagulants ('blood thinners'). It works by decreasing the clotting ability of the blood." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html (last visited Aug. 13, 2015).

[2] Flexeril is a brand name for Cyclobenzaprine, a skeletal muscle relaxant which relieves muscle spasm of local origin without interfering with muscle function. *See* Phys. Desk Ref. 1481 (64th ed. 2010).

[3] "Digoxin is used to treat heart failure and abnormal heart rhythms (arrhythmias)." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682301.html (last visited Aug. 13, 2015).

[4] **Error! Main Document Only.**Lopressor is a brand name for Metoprolol, a beta blocker used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html (last visited Aug. 13, 2015).

[5] **Error! Main Document Only.**Prilosec, or Omeprazole, is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last visited Aug. 13, 2015).

[6] **Error! Main Document Only.**Vicoprofen combines the opioid analgesic hydrocodone bitartrate with the NSAID agent Ibuprofen. It is indicated for the short-term management of acute pain. Phys. Desk Ref. 578 (65th ed. 2011).

[7] **Error! Main Document Only.**Zestril is a brand name for Lisinopril, an ACE-inhibitor, used to treat high blood pressure and heart failure. http://www.nlm.nih.gov/medlineplus/druginfo/meds /a692051.html (last visited Aug. 13, 2015).

[8] **Error! Main Document Only.**Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited Aug. 13, 2015).

*Id.* He initially made no mention of napping during the day or watching television extensively. *Id.* He asserted that his conditions pose no challenge to his ability to care for himself, including dressing himself. (Tr. 229) Yet he elsewhere indicated that he has "problems getting in and out of the bathtub and putting on [his] socks and shoes." (Tr. 259) He complained that he has difficulty lying in "a certain position for a length of time." (Tr. 229)

Plaintiff stated that he does not need to be reminded to tend to his personal needs or to take his medications, and he prepares his own meals daily. (Tr. 230) He also reported cleaning his apartment, doing laundry, and ironing weekly, but he said that he has difficulty standing at the sink, mopping, and completing the laundry. *Id.* He leaves his house daily; he is able to walk and to drive. (Tr. 231) He shops for his own food, about every two weeks, and able to pay his own bills, handle a savings account, use a checkbook, and count change. *Id.*

Plaintiff's only hobby is watching television. (Tr. 232) He reported that he does not go anywhere on a regular basis. *Id.* Plaintiff explained that he "used to be very hard to get along with because of [his] pain and depression," and he does not attend social events because he "can't sit or stand that long." (Tr. 233)

Plaintiff reported difficulty with lifting, walking, squatting, bending, standing, sitting, and kneeling. *Id.* He specified that he "can only lift about 20 lbs.[, he] can't bend or squat or kneel without pain[,] and [he] can only walk so far." *Id.* However, he reported no difficulties with stair climbing, memory, completing tasks, concentration, following instructions, using his hands, getting along with others, or reaching. *Id.* He explained that he can only walk "a few blocks" before he needs to rest. *Id.* He has no trouble getting along with authority figures, and he reported

being "good" at handling stress and changes in his routine. (Tr. 234) Plaintiff complained that he "can do less and less" and that he is "very tired all the time." (Tr. 259)

In a third-party report plaintiff's brother stated that plaintiff suffers from "pain in his back an[d] stomach." (Tr. 263-265) "At one time" plaintiff used a cane to ambulate "around the house." (Tr. 264) Plaintiff's brother was "not sure" how long plaintiff could sit before having to stand up or lie down or how much plaintiff can lift. *Id.* The report states that plaintiff has difficulty performing "all" daily activities and that plaintiff is "often" stressed. (Tr. 264–65)

Plaintiff's girlfriend of nine years also completed a third-party report. (Tr. 267–69) According to her report, plaintiff suffers from back pain and stomach pain that causes him to remain at home; he is "very depressed." (Tr. 267) She reported that plaintiff used a cane to ambulate after two back surgeries, though not at present. (Tr. 268) She also reported that plaintiff cannot lift more than fifteen or twenty pounds, and he cannot sit for "long" before he must get up or lie down. *Id.* Additionally, she noted that plaintiff has "let himself go," such that the girlfriend's daughter must "help him out [of] his chair." *Id.* Plaintiff prefers to "stay to himself," and he is "easily upset," having no patience for anyone, according to her statement. (Tr. 269)

Thomas Musich, M.D., evaluated plaintiff—at the request of an attorney—on June 19, 2008. (Tr. 285–90) Dr. Musich reviewed plaintiff's medical records and summarized some of them, and he also took plaintiff's self-report of his condition. Dr. Musich additionally performed an independent evaluation of plaintiff's condition. (Tr. 288) Plaintiff weighed 300 pounds at the time of the evaluation. *Id.* He also

had high blood pressure.  *Id.*  Plaintiff experienced lower back pain in response to deep palpation in the L4-L5 area.  *Id.*  Plaintiff's lumbar extension was limited to eighteen degrees.  *Id.*  But his straight leg raise test was negative for abnormalities.  *Id.*  His gait was stable.  *Id.*  He was observed "mov[ing] about the examination room in order to find a more comfortable, less painful position."  *Id.*  Dr. Musich opined that plaintiff "suffers a permanent partial disability of 50% of the man as a whole referable to the work trauma of June 2004."  (Tr. 289)  Dr. Musich did not expound on his opinion to delineate how he arrived at his assessment that plaintiff is 50% disabled "as a whole," nor did the physician explain in which areas of the body and at what percentages plaintiff is precisely disabled.  (Tr. 289–90)

Larry Nichols, D.O., one of plaintiff's treating physicians, supplied a medical source statement regarding plaintiff's conditions.  (Tr. 638–41)  Dr. Nichols opined that plaintiff would be limited to lifting ten pounds occasionally and ten pounds frequently.  *Id.*  According to Dr. Nichols, plaintiff could stand or walk for at least two hours in an eight-hour workday.  *Id.*  Dr. Nichols also believed that plaintiff would be able to sit, with normal breaks, for less than six hours out of an eight-hour workday.  (Tr. 639)  Dr. Nichols wrote that plaintiff's "pain in [his] back" would limit his ability to push or pull.  *Id.*  As evidentiary support for those conclusions, Dr. Nichols said only the following:  "Reported by patient—these activities cause severe pain."  *Id.*  Dr. Nichols did not cite any medical records or his own observations from his past examinations of plaintiff to support his conclusions in the medical source statement.

Similarly, Dr. Nichols opined that plaintiff could never climb, balance, kneel, crouch, crawl, or stoop "due to 'pain.'"  This opinion,, too, was supported only by

the statement that, "patient reports activities simply 'too painful.'" *Id.* Dr. Nichols also opined that plaintiff had no limitations handling, fingering, or feeling, but would be limited in reaching to doing so only occasionally because of "pain with extreme or frequent reaching." (Tr. 640) Plaintiff would be limited in his ability to work around heights or machinery, or in extreme temperatures, according to Dr. Nichols, due to "pain with extreme cold, [and his] balance [would be] unstable due to pain [and] arthritis." (Tr. 641) Relevant to the issues plaintiff raises on appeal, however, in his medical source statement, Dr. Nichols did not say that plaintiff has any limitations due to incontinence or gastrointestinal conditions. (Tr. 638–41)

### B. <u>Testimony at the Hearing</u>

On March 14, 2013, the ALJ held a hearing, which plaintiff and his counsel attended. (Tr. 71–115) At the time of the hearing, plaintiff was forty-nine years old. (Tr. 74) Plaintiff admitted that he had received unemployment benefits after his alleged onset date. (Tr. 74–75) According to plaintiff, he was terminated from his most-recent job at Wal-Mart in 2011 for "medical reasons," specifically that he was "having constant bouts with pancreatitis," which caused him to be "constantly" absent from work. (Tr. 75) At the time of the hearing, plaintiff weighed 329 pounds. *Id.* Plaintiff testified that his weight gain was attributable to "inactivity from not being able to exercise." (Tr. 76)

Plaintiff was not receiving unemployment benefits at the time of the hearing, but he was receiving food stamps and Medicaid assistance. *Id.* He had served in the Marine Corps, from which he received an "other than honorable" discharge due to unauthorized absences. (Tr. 77) He completed secondary school through the eleventh grade, and he eventually completed a GED. *Id.*

In response to questioning by his attorney, plaintiff initially testified that he has no problems with his ears. (Tr. 78) When the question was repeated, however, plaintiff testified that he "sometimes" has ringing in his ears, "maybe two" or "three times a week" for "[a]bout an hour" to an "hour-and-a-half." *Id.* The only effect of the ringing, he claimed, was that it "just bothers" him; he did not allege any specific limitations due to his purported ear condition. *Id.*

Plaintiff recalled that in 2004 he underwent underwent a spinal fusion and discectomy in which a cage, a block, and four screws were inserted in and around his lower spine. (Tr. 78–79) In 2006, plaintiff had a second spinal surgery; physicians checked the previously installed hardware and placed a second plate or rod down the front of his spine. (Tr. 79) Plaintiff complained that post-surgery he had "constant pain" and "limited mobility." *Id.* According to plaintiff, the pain radiates from his lower back to his left thigh and into his buttocks. (Tr. 80) He testified that his pain is sometimes throbbing and also "pulls down"; when he walks after standing for "so long," he feels a "shock." *Id.* Following the first surgery, his back pain has never subsided; after the second surgery, the pain increased and began radiating to his left leg. *Id.*

Plaintiff's pancreatitis was not affecting him on the day of the hearing. (Tr. 82) He complained of knee pain when he walks. *Id.* He has also suffered from atrial fibrillation of the heart since 2005, though he had not required electroshock therapy to return it to normal rhythm for "probably two to three years." (Tr. 83) He also testified that he experiences shortness of breath or chest pains "from time-to-time," "maybe two [or] three times a month." *Id.* He claims that he can only walk "not quite two blocks" before he is short of breath. (Tr. 84)

Plaintiff additionally testified that he has a degenerative disk in his neck, which hurts and is stiff "from time-to-time." (Tr. 85) He described the frequency of his neck pain as "daily," with the condition getting worse in cold weather. *Id.* He claimed that his neck hurts for three-to-four hours per day. (Tr. 86) He described the neck pain as "aching," not exacerbated by any particular activities. *Id.*

Plaintiff also overdosed on Coumadin in February of 2013, which caused his arms to swell and develop blood clots. *Id.* His left arm also purportedly swells at the wrist and elbow "from time-to-time," a condition that began during his basic training in the military in 1979, after he fell off of a set of monkey bars. (Tr. 87) Plaintiff also testified that, since the Coumadin overdose, he has had some numbness in his right fingers and swelling in his right arm. (Tr. 88)

Additionally, he suffers from GERD, which causes him to vomit "maybe two or three times a week." *Id.* The vomiting symptoms began in 2005. (Tr. 89) Plaintiff also testified that he experiences diarrhea daily, sometimes four or five times a day. *Id.* He estimated that during a typical day he needs four or five bathroom breaks, lasting twenty or twenty-five minutes each time. (Tr. 90)

Plaintiff also complained of low energy. In June 2012, he was diagnosed with diabetes which sometimes causes him to experience headaches. When that happens, he checks his blood sugar, takes his medication, and rests for three or four hours. (Tr. 92) The headaches occur three or four times per week. *Id.* He is prescribed Metformin[9] for diabetes. *Id.* For the last several years, plaintiff has been napping for an hour to an hour-and-a-half every afternoon. (Tr. 93) He also said that he lies down when his back begins to hurt, about four times per week. *Id.*

---

[9]Metformin is an oral medication for the treatment of Type 2 diabetes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited Aug. 13, 2015).

Though he had seen a psychiatrist or a psychologist in November 2012, plaintiff was not receiving any psychological treatment at the time of the hearing. *Id.* He testified that his prior treatment was for depression, and he was still suffering from depression, for which he received Zoloft but no ongoing therapy. (Tr. 94) In plaintiff's words, he "really [does not] like to be around people." *Id.* He complained that he suffers from crying spells "[a]bout three times a week" for "an hour or something like that." *Id.* He denied illegal drug use and alcohol abuse. *Id.*

Since January 2013, plaintiff has taken Oxycodone[10] twice daily, and he sometimes takes OxyContin[11] when his pain reaches a "breakthrough" level. (Tr. 95) Prior to receiving those prescriptions, plaintiff had been taking Vicodin[12] since 2005, after his first back surgery. (Tr. 96) He also testified that he takes Meloxicam,[13] for arthritis, Digoxin, Lisinopril, and Lovastatin,[14] as well as Coumadin,

---

[10]**Error! Main Document Only.**Oxycodone is also known as Percocet. Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. *See* Phys. Desk. Ref. 1114 (60th ed. 2006).

[11]**Error! Main Document Only.**Oxycodone hydrochloride is indicated for management of moderate to severe pain when a continuous round-the-clock opioid analgesic is needed for an extended period. It is not for use on an as-needed basis. *See* Phys. Desk. Ref. 2879–80 (65th ed. 2011).

[12]**Error! Main Document Only.**Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. *See* Phys. Desk. Ref. 530–31 (60th ed. 2006).

[13]**Error! Main Document Only.**Meloxicam is a nonsteroidal anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. It can also be prescribed to treat ankylosing arthritis.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601242.html (last visited Aug. 13, 2015).

[14]"Lovastatin is used together with diet, weight-loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease. Lovastatin is also used to decrease the amount of cholesterol . . . and other fatty substances in the blood."
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688006.html (last visited Aug. 13, 2015).

Prevachol,[15] and Lexapro.[16]   (Tr. 96–97)   The only purported side effects of his medication are diarrhea and vomiting.  (Tr. 97)

Plaintiff testified that he wakes up about two times per night, sometimes from pain and sometimes because he "just can't sleep."  (Tr. 98–99)  He "probably" awakens between 8:00 and 9:00 in the morning, but he also testified that he "quite often" awakens only between 1:00 or 2:00 in the afternoon, "around three [or] four days a week."  (Tr. 99)

He testified that he spends his day "just watching television."  *Id.*  However, he claimed that he can only sit comfortably for twenty or twenty-five minutes before he needs to "stand up and walk around."  (Tr. 100)  Plaintiff also claimed that in total he can only sit for "[a]bout three" or "four hours" in an eight-hour day. *Id.*

Plaintiff testified that he can stand comfortably for 25 minutes but he then needs to sit for "about" fifteen-to-twenty minutes.  (Tr. 100)  He claimed that he can stand for a total of  "three to four hours" per day.  *Id.*  He also testified that he can lift up to fifteen or twenty pounds without pain, but he experiences pain in his arms or knees if he does so.  (Tr. 101)  Still, he can lift ten pounds without pain. *Id.*  He reports that he cannot bend, squat, or stoop without pain, however.  *Id.*

---

[15]Prevachol is a brand name for Pravastatin, which "is used together with diet, weight-loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease. Pravastatin is also used to reduce the amount of fatty substances such as low-density lipoprotein (LDL) cholesterol ('bad cholesterol') and triglycerides in the blood and to increase the amount of high-density lipoprotein (HDL) cholesterol ('good cholesterol') in the blood."
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692025.html (last visited Aug. 13, 2015).

[16]**Error! Main Document Only.**Lexapro, or Escitalopram, is used to treat depression and generalized anxiety disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html (last visited Aug. 13, 2015).

Susan Shea, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and past relevant work experience who retains the residual functional capacity (RFC) to perform sedentary work that is lower stress or low stress, and unskilled. (Tr. 110) Shea testified that such lower stress jobs "do not deal with the public and do not have a strict production rate." *Id.* With those limitations, the vocational expert testified that such a person could not return to any of plaintiff's past relevant work. (Tr. 114)

However, such an individual could work in jobs that exist in significant numbers in the national economy, according to Shea. (Tr. 111) Shea stated that examples of such jobs would include working as a hand assembler, a table worker, or a surveillance system monitor. *Id.* Plaintiff's counsel then asked Shea what percentage of the time such a person could be off task in those representative positions and still be considered employable. (Tr. 112) The expert responded that someone who was off task "ten percent of the work time would not" be able to remain employed. *Id.* Shea also testified that a person who needed to take twenty-minute bathroom breaks would not be able to maintain competitive employment. (Tr. 113) Additionally, according to the vocational expert, such an individual could be absent from work no more than two days per month on an ongoing basis. *Id.* Further, if such an individual were limited to sitting no more than four hours per day, that would preclude competitive employment. (Tr. 114)

### C.  **Medical Records**

### 1. **Pre-Application Records**

On October 6, 2010, plaintiff was examined by Larry Nichols. D.O. (Tr. 298) Dr. Nichols noted that plaintiff reported being "very depressed" and suffering "pain constantly in his knees, predominantly, but also his back." *Id.* Dr. Nichols also noted that plaintiff had been prescribed Lexapro but that, because of a lack of insurance, he was unable to continue the treatment. *Id.* At that examination, Dr. Nichols also observed no abnormalities with plaintiff's neck. *Id.* Dr. Nichols noted plaintiff's history of hypertension, for which he was on medications described herein, noted that plaintiff was "morbidly overweight," and also noted that plaintiff had a history of atrial fibrillation. (Tr. 299) Dr. Nichols prescribed Zoloft to treat plaintiff's depression. *Id.*

On December 9, 2010, plaintiff presented to the emergency room with chest pain, nausea, and vomiting. (Tr. 453) Dr. Nichols noted that plaintiff has a chronic history of back pain. (Tr. 437) He was also noted to have atrial fibrillation and depression. *Id.* At that time, plaintiff denied "muscle pain, joint pain, swelling[,] or weakness." (Tr. 440) Plaintiff's neck was not noted to have any abnormalities. *Id.* He also denied any urinary problems, including any constant need for the bathroom. (Tr. 440, 446) His condition was listed as "improved," and he was discharged, ambulating by himself to leave the hospital. (Tr. 445)

Plaintiff returned to the hospital on December 12, 2010, and he was discharged three days later. (Tr. 405) He had acute pancreatitis. (Tr. 405, 410) He was also noted to have the same conditions discussed elsewhere, *e.g.*, morbid obesity, depression, chronic low back pain, and GERD. *Id.* During that hospital stay, plaintiff's urinalysis was "unremarkable." (Tr. 406, 409) Plaintiff had not been taking his prescribed medications. (Tr. 406–07) According to the hospital

reports, plaintiff had "arthritis, particularly [in] his knees and low back." (Tr. 408) Once again, his neck was reported as normal. (Tr. 409) Plaintiff had "[p]ost surgical changes in the lower lumbar spine," with a "small amount of pelvic free fluid of uncertain etiology, sigmoid diverticulosis without any evidence of acute diverticulitis." (Tr. 410) Plaintiff told examining physician Karl Harmston, D.O., that he had been experiencing chronic "achy" back pain for five years. (Tr. 413) He self-reported that "movement and walking" caused his back pain to increase. *Id.* He averred that he was single and lived alone, not with his girlfriend of nine years. *Id.*

On December 17, 2010, Dr. Nichols again examined plaintiff. (Tr. 300) Following his hospitalization for "acute pancreatitis," plaintiff was "very fatigued" but was "overall much better." *Id.* His vital signs were unremarkable except for elevated blood pressure and GERD symptoms. *Id.*

On January 21, 2011, plaintiff again was seen at his local hospital for chest pain; a heart attack was ruled out as the cause. (Tr. 374–404) At the time he was discharged the next day, "he ha[d] no discomfort." (Tr. 374) Plaintiff's neck was again asymptomatic. (Tr. 378) Plaintiff's extremities were also unremarkable. *Id.* Richard Ha, M.D., determined that plaintiff's "symptom[s] [were] highly unlikely anything to do with any significant obstructive coronary artery disease." (Tr. 379)

Radiologist Jada Anderson, M.D., found "[n]o evidence of active cardiopulmonary disease." (Tr. 389, 399) In fact, plaintiff had "no acute findings" related to his chest pain. (Tr. 390) Further, plaintiff's muscle strength and flexion were normal and strong in all of his extremities. (Tr. 392) Dr. Ha's final diagnosis before discharging plaintiff was that he had "moderate concentrical hypertrophy of

the left ventricle," but with "preserved left ventricular systolic function." (Tr. 404) He also had "[m]ore than moderate left atrial enlargement," "abnormal left ventricular inflow," "with left ventricular diastolic dysfunction." *Id.* Based on that diagnosis, plaintiff was advised to continue his existing medications, including Coumadin and medications for hypertension, and to follow up for additional monitoring. (Tr. 374)

Dr. Nichols examined plaintiff again on February 15, 2011. (Tr. 301) Dr. Nichols observed that plaintiff was experiencing acid reflux. *Id.* He was advised to take Omeprazole[17] and given samples of Kapidex[18] for his condition. *Id.*

On February 18, 2011, Donald Miller, D.O., examined plaintiff after he reported to the emergency room complaining of "sharp" "stomach pain." (Tr. 360–73) At that time, notwithstanding his other reports of chronic back pain, plaintiff self-reported that he did not suffer from any chronic pain. (Tr. 360–61, 369) Nor was plaintiff experiencing any vomiting or chest pain, and he denied nausea. (Tr. 364) He also denied any urinary difficulties and denied that he needed to relieve himself frequently. *Id.* He did not complain of muscle pain, joint pain, swelling, or weakness. *Id.* His neck was again not noted to have any abnormalities. *Id.* His extremities were normal. *Id.* Plaintiff was discharged from the emergency room in a stable condition with a several-day supply of Vicodin and a request to follow-up with Bhagirath Katbamna, M.D., in a week. (Tr. 368, 371) He self-ambulated from

---

[17]"Prescription omeprazole is used alone or with other medications to treat [GERD] . . . ." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last visited Aug. 14, 2015).

[18]Kapidex is "Dexlansoprazole[, which] is used to treat [GERD] . . . ." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609017.html (last visited Aug. 14, 2015).

the emergency room and was not noted to have any difficulty walking or standing on his own. *Id.*

Plaintiff again was seen at his local hospital on February 23, 2011. (Tr. 351–59) Dr. Nichols observed that plaintiff "is just acting as though he is very uncomfortable with [his] abdomen." (Tr. 352) Plaintiff had "not had any nausea, vomiting, diarrhea, or constipation." *Id.* Dr. Nichols was unable to perform a "good palpatory exam because of the pain." (Tr. 353) So Dr. Nichols admitted plaintiff to the hospital and administered intravenous fluids and morphine. *Id.* Upon examining plaintiff, Dr. Nichols observed that plaintiff "[did] not appear to be in acute distress." (Tr. 355) At that time, all of plaintiff's extremities were noted to be normal. *Id.* Dr. Katbamna "suspect[ed]" plaintiff had a "recurrence of his pancreatitis." *Id.* Dr. Anderson's scans of plaintiff's abdomen revealed "perhaps recurrent pancreatitis" without "secondary complications." (Tr. 358) Conclusive results and an ultimate diagnosis are not present in the record. (Tr. 351–59)

A few weeks later, on March 15, plaintiff was examined by Mikhail Bassem, M.D. (Tr. 303) Dr. Bassem observed that plaintiff's "[n]eck demonstrates no decrease in suppleness." *Id.* In addition, plaintiff's back was reported to be "normal," with no indications that he complained of back pain. (Tr. 304) Dr. Katbamna examined plaintiff a few days later, on March 23, and noted that plaintiff's extremities were "without cyanosis, clubbing[,] or edema." (Tr. 305) Dr. Katbamna also did not report plaintiff complaining of back or leg pain. *Id.*

On April 24, 2011, plaintiff again sought treatment at the emergency room, this time for an "upset" stomach, abdominal pain, and symptoms that included vomiting. (Tr. 332–50) He was given intravenous and oral medications for nausea

and vomiting.  (Tr. 333, 344)  Plaintiff reported that he "does not have chronic pain."  (Tr. 332, 343)  Indeed, plaintiff was observed to have "[n]o myalgia, muscle weakness, joint pain[,] or back pain."  (Tr. 336)  Plaintiff was specifically observed to have the following musculoskeletal conditions:  "All extremities, back, hip/pelvis without trauma or obvious abnormalities.  No pain or edema of the joints and [range of motion] normal.  The muscles, tendons, ligaments, [and] bones are non-tender and functioning normally.  Posture and weight[-]bearing normal."  *Id.*

At that time, plaintiff reported that he was single and lived alone.  (Tr. 333)  He also reported that he drank three to four cans of beer daily.  *Id.*  Despite the abdominal pain, he was not experiencing any diarrhea, and no treatment notes from the April 24 examinations indicate that plaintiff needed to relieve himself frequently.  (Tr. 336)

Debra Oden, M.D., found no evidence of pancreatitis and no bowel obstruction when she examined plaintiff the next day.  (Tr. 341)  Dr. Oden's observation of a CT scan of plaintiff's abdomen revealed "[p]ostsurgical change of the lumbar spine at L4 and L5," but Dr. Oden did not observe any then-present symptoms resulting from plaintiff's spinal fusion surgeries, nor did the radiologist who performed the scan.  (Tr. 341, 346)  After plaintiff repeatedly refused to explain to various medical personnel why he continued to press his nurse call button, refused to rate his pain, and was uncooperative, plaintiff self-discharged on April 25 in a stable condition and was told to follow up.  (Tr. 341, 345)  He again ambulated out of the emergency room completely unaided, and no treatment records from that hospitalization indicate plaintiff had any difficulty walking, standing, or maintaining himself in a seated position.  (Tr. 332–50)

Plaintiff was admitted to the hospital on May 9, 2011, again for acute pancreatitis. (Tr. 308) He was noted to have a final diagnosis of, among other things, atrial fibrillation, pulmonary emboli, hypertension, morbid obesity, hyperlipidemia, GERD, chronic low back pain, anxiety or depression, previous congestive heart failure, benign prostatic hypertrophy, allergic rhinitis, and rectal dysfunction. *Id.* According to Dr. Nichols's treatment notes, though plaintiff initially had acute pancreatitis, by the time he was discharged on May 11, "[h]is pain was pretty much resolved." (Tr. 309)

During that several-day hospital stay, plaintiff had no noted abnormalities of the neck and no neck pain. (Tr. 312, 319) During one examination, Aziz Doumit, M.D., noted that plaintiff had "[n]o myalgia, muscle weakness, joint pain[,] or back pain." (Tr. 319) Specifically, Dr. Doumit observed the following: "All extremities, back, hip/pelvis without trauma or obvious abnormalities. No pain or edema of the joints and [range of motion] normal. The muscles, tendons, ligaments, bones are non-tender and functioning normally. Posture and weight[-]bearing normal." *Id.*

The treatment notes indicate plaintiff drove himself to the hospital and ambulated without an assistive device. (Tr. 313) Plaintiff reported to the treating personnel that he was single and lived alone. (Tr. 316) Extensive other medical records from the May 2011 hospital stay are consistent with the records described herein and are not otherwise notable. (Tr. 308–31)

## 2. Post-Application Records

Plaintiff was treated in the Hannibal Regional Hospital emergency room on December 8, 2011. (Tr. 496–504) He arrived complaining of chest pain. (Tr. 496) Plaintiff admitted that, due to financial constraints, he had not taken medications

for his high blood pressure and atrial fibrillation for "about a year." *Id.* In fact, plaintiff reported that he was not taking any medications and had not since May of 2011. (Tr. 501) He was provided aspirin, Lopressor, Toradol,[19] and Reglan[20] in the emergency room. (Tr. 502) He was given a prescription for Naprosyn[21] and was given 12 Vicodin pills, and he was advised to avoid spicy, fried, and fatty foods. (Tr. 503) After the emergency room personnel found nothing emergently wrong with plaintiff, they discharged him with instructions to follow up with Dr. Nichols. (Tr. 504)

On March 28, 2012, plaintiff again sought treatment in the emergency room, this time with "left back pain into his left bottom" that radiated into his "left thigh to his left knee." (Tr. 463) Plaintiff complained that he had been suffering from that pain for "several months." (Tr. 466) He denied any "urinary or fecal incontinence." *Id.* Plaintiff's neck was asymptomatic. *Id.*

Plaintiff had "mild, diffuse tenderness to palpation of [his] left knee, with range of motion restricted by pain." *Id.* But he had "no joint effusion" and "no warmth[] or erythema to the knee joint." *Id.* He was also experiencing "mild tenderness to palpation to the lower lumbar spine, especially on the left, as well as the left buttock area," with "focal" tenderness to palpation over the anterior surface of his proximal tibia bilaterally. *Id.* Yet "no change in [his] range of motion" or

---

[19]Toradol is "a trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal anti-inflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" *See* Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

[20]Reglan is used to relieve nausea by speeding the movement of food through the stomach and intestines. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601158.html (last visited Aug. 19, 2015).

[21]Naprosyn is a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. *See* Phys. Desk Ref. 2769–70 (60th ed. 2006).

"purposeful movement" was observed, and he had "no swelling" and "no obvious deformity," with "no bruising and no redness." (Tr. 473) "Flexion [and] extension of all extremities [was] strong [and] equal," without any edema. (Tr. 474)

Moreover, x-rays of plaintiff's spine revealed "no evidence of hardware complication," "[n]o acute fractures," "no evidence [of] marked degenerative change[s]," and no "evidence [of] complication[s]." (Tr. 469) As David Greengart, M.D., explained upon review of the results, plaintiff was "[s]tatus post fusion," with "no other acute abnormalities." (Tr. 470) The x-rays of plaintiff's knee also revealed "[n]o acute findings." *Id.* Though he had a "[p]ossible Osgood-Schlatter[22] deformity[,] [t]he remainder of the knee [was] unremarkable." *Id.* Plaintiff was given a splint, ice, an ace bandage, crutches, and twenty Vicodin pills and a month's supply of Flexeril; he was discharged in "routine" condition with instructions to follow up with Dr. Nichols. (Tr. 471, 475, 479) On May 23, 2012, plaintiff was examined by Christopher Bieniek, M.D., who observed plaintiff's knee pain and, in response, injected his knees with Kenalog[23] and Lidocaine.[24] (Tr. 578)

Plaintiff once again sought emergency treatment on June 12, 2012, complaining of abdominal pain, frequent urination, a mid-sternum "lump," back pain, shortness of breath, and feeling "tired." (Tr. 505–06) He denied experiencing

---

[22]"Osgood-Schlatter disease is a painful swelling of the bump on the upper part of the shinbone, just below the knee. . . . Osgood-Schlatter disease is thought to be caused by small injuries to the knee area from overuse before the knee is finished growing. . . . The main symptom is painful swelling over a bump on the lower leg bone (shinbone). Symptoms occur on one or both legs. . . . Osgood-Schlatter disease will almost always go away on its own once [a] child stops growing." https://www.nlm.nih.gov/medlineplus/ency/article/001258.htm (last visited Aug. 19, 2015).

[23]**Error! Main Document Only.**Kenalog is the "trademark for preparation of triamcinolone acetonide[,]" which is "an ester of triamcinolone; applied topically to the skin or oral mucosa as an anti[-]inflammatory[.]" *See* Dorland's Illustrated Med. Dict. 992, 1986 (31st ed. 2007).

[24]Lidocaine "causes numbness . . . in an area of [the] body. It is a local anesthetic." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010944/ (last visited Aug. 19, 2015).

diarrhea, nausea, or vomiting.  (Tr. 509)  He also denied suffering from depression.  *Id.*  His neck was unremarkable.  (Tr. 509–10)  No problems with his extremities were noted.  *Id.*  The emergency room personnel indicated that, though plaintiff said he was "tired," he was not experiencing "fatigue."  (Tr. 518)  He was also reported to have no dysfunction in emptying his bowels or with urination.  *Id.*  He denied any swelling of the joints.  (Tr. 519)  In addition, plaintiff had no edema of the extremities, no noted respiratory distress;  his breath sounds were clear, his heart rate was normal, and his abdomen was soft though tender on his left side.  *Id.*  All of his extremities were "strong."  *Id.*

Dr. Oden found "no acute" results upon x-raying plaintiff's chest.  (Tr. 515)  Dr. Oden found "diffuse fatty infiltration of the liver" and "degenerative changes in the lumbar spine," but she observed "[n]o bowel obstruction, free fluid[,] or free air" in plaintiff's abdomen.  (Tr. 516)  Plaintiff was diagnosed with lower back pain, mid-sternal chest pain, and Type 2 diabetes.  *Id.*  He was then discharged in "routine" and "improved" condition, at which time he was not in any further respiratory distress, his vital signs were within normal limits, his condition was stable, and he was able to self-ambulate without difficulty.  (Tr. 517, 529)  He was again provided Vicodin, and he was prescribed Prilosec, Lopressor, and Zoloft.  (Tr. 526)  He was advised to follow up with Dr. Nichols the next day, June 13.  (Tr. 517)

On June 20, 2012, plaintiff was examined by Dr. Nichols related to his diabetes.  (Tr. 571)  Dr. Nichols remarked that he had not seen plaintiff since February of 2011.  *Id.*  Plaintiff was given a glucose meter.  *Id.*  He admitted not taking his prescription Coumadin or Zoloft.  *Id.*  Dr. Nichols offered to refer plaintiff to a chronic pain specialist, Dr. Glanton, for his back pain.  (Tr. 571–72)  There are

no notes in the record that plaintiff sought such treatment. Plaintiff's neck, heart, lungs, and abdomen were normal, though his abdomen was "very large," as he weighed 322 pounds. *Id.* His extremities were also normal. (Tr. 571)

Plaintiff complained of bilateral knee pain on October 5, 2012, for which he was again injected with Kenalog and Lidocaine. (Tr. 578) He also complained of elbow pain on October 19, 2012, but the physician found no tenderness, an excellent range of motion, and no instability; for that pain plaintiff was given an anti-inflammatory. (Tr. 577)

On November 8, 2012, plaintiff sought treatment at the emergency room for what he described as "the same kind of pain as [he] had when [he] was in atrial fibrillation." (Tr. 530) Plaintiff stated that he was "unemployed because of his chronic back pain." (Tr. 531) Upon receiving Motrin, plaintiff reported that his chest pain was "all but gone." *Id.* His neck was normal. *Id.* His abdomen was non-tender, without any mass. (Tr. 532, 535) His urinalysis was also unremarkable, and he was not noted to have any difficulty urinating or defecating, or any frequent need to do so. *Id.* He was not experiencing nausea, vomiting, or diarrhea. (Tr. 541) His chest x-ray also showed "no acute" findings. (Tr. 532) Dr. Nichols prescribed plaintiff OxyContin for his back pain, Motrin, Metformin, Lopressor, Protonix,[25] Zoloft, Lisinopril, and Coumadin. (Tr. 533)

The consulting physician, Mikhail Bassem, M.D., initially noted that plaintiff's chest pain "appears to be pleuritic in nature," *i.e.*, exacerbated by forceful breathing, yet without accompanying shortness of breath. (Tr. 534–35) Dr. Bassem later determined that plaintiff's chest pain was "musculoskeletal in nature

---

[25]Protonix, the brand name for Pantoprazole, is used to treat GERD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html (last visited Aug. 19, 2015).

versus pleuritic," with "no significant effusion." *Id.* During the examination, plaintiff "den[ied] any other significant symptoms," and he had "no other complaints." (Tr. 534, 541) He admitted to foregoing his prescribed Digoxin two weeks before the November 2012 emergency room visit. (Tr. 534) He also denied depression, anxiety, muscle pain, joint pain, swelling, weakness, and chronic pain. (Tr. 541, 550) No evidence of acute cardiopulmonary disease was found. (Tr. 549, 560) Plaintiff was discharged and advised to follow up with Dr. Bassem in two weeks. (Tr. 536)

Plaintiff was advised by Dr. Nichols to watch his diet more carefully due to his diabetes on November 19, 2012. (Tr. 567) His heart, lungs, extremities, and abdomen were all normal; his abdominal pain was "completely gone." (Tr. 574) Plaintiff complained of a sore left nipple, but it was "getting better," no mass was found, and both Dr. Nichols and plaintiff agreed that "simple observation is all that [was] necessary." *Id.* Plaintiff was advised to "watch [his] alcohol usage" because of his history of "mild" pancreatitis. *Id.* He complained to Dr. Nichols that his "depression [was] worse" after the recent death of his brother, and Dr. Nichols increased plaintiff's Zoloft prescription from 50 mg to 100 mg in response. (Tr. 575) Plaintiff was advised to follow up with Dr. Nichols in three months unless his increased dose of Zoloft was not effective, in which case he should return in a month. *Id.* A few weeks later, on December 11, Dr. Bieniek advised plaintiff to acquire Cho-Pat straps to alleviate the tenderness and pain in his knees. (Tr. 577)

Plaintiff was admitted to the emergency room on February 4, 2013, for "[g]ross edema" of the right arm, "causing severe pain," as a result of "Coumadin overdose." (Tr. 580) Plaintiff reported that a few days before he was admitted, he

had "been moving furniture" and he had "hit both arms." *Id.* Dr. Nichols suspected that plaintiff "had some bleeding into the soft tissue, which was the cause of the swelling due to the hypercoagulation." *Id.*

After two days of monitoring and continuing his regular medications, except for Coumadin, plaintiff's swelling had "significantly improved" and his blood coagulation ratio "was back to normal." (Tr. 581) Plaintiff was "feeling much better" and the "swelling in his right arm [was] much improved," and he was "able to use his hands" by February 6. (Tr. 590) He was discharged in stable condition with instructions to keep his arm elevated and to ice it. (Tr. 581) Notably, plaintiff was not indicated to have experienced any nausea, vomiting, diarrhea, or abdominal pain, or any gastrointestinal issues, while in the emergency room in February of 2013. (Tr. 597, 605) Plaintiff also did not suffer from any fatigue at that time. (Tr. 604) He reported not feeling sad or anxious. *Id.*

On February 8, 2013, plaintiff followed up with Dr. Nichols regarding his emergency room visit from earlier in the month. (Tr. 632) According to Dr. Nichols, plaintiff explained that "last week he was moving from one home to another [and] he was carrying a lot of furniture, [and] 'banged his arms up.'" *Id.* Upon examination, Dr. Nichols found plaintiff's neck was normal, his abdomen was soft and non-tender, he had no edema of the extremities, and his right arm was swollen with "a little bit of discomfort" but it was "much improved." *Id.* Dr. Nichols prescribed a temporary dose of Prednisone[26] to reduce the remaining swelling in

---

[26]"Prednisone is used alone or with other medications to treat the symptoms of low corticosteroid levels. . . . Prednisone is also used to treat other conditions in patients with normal corticosteroid levels. These conditions include certain types of arthritis; severe allergic reactions; multiple sclerosis . . . ; lupus . . . ; and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. Prednisone is also sometimes used to treat the symptoms of certain types of

plaintiff's arm and instructed him to follow up in a month.  (Tr. 633)  When plaintiff returned on February 18 for an unscheduled early follow-up, he still had swelling, and Dr. Nichols ordered an MRI, the results of which were not submitted.  (Tr. 635)

### III.    Post-Decision Records

On May 14, 2013, plaintiff was examined by Dr. Bieniek.  (Tr. 14)  At that time plaintiff complained of bilateral anterior knee pain, which was greater on his left side than his right.  *Id.*  An MRI revealed that plaintiff's left knee showed "some patellar tendinitis and some partial tears of the patellar tendon."  *Id.*  Dr. Bieniek noted that plaintiff ambulated with a cane and self-reported taking anti-inflammatory medications "without benefit."  *Id.*  Plaintiff was also using a patellar tendon Cho-Pat strap, but "without benefit."  *Id.*  Dr. Bieniek observed that plaintiff was "generally healthy . . . , but with some obesity."  *Id.*  He recorded a regular heart rate and rhythm with no murmurs and normal motor control.  *Id.*

Though plaintiff had significant left knee tenderness along his patellar tendon, Dr. Bieniek observed that plaintiff had "full range of motion, a little bit of patellofemoral crepitus and tenderness with motion," but with "normal knee stability" and "no effusion."  *Id.*  Dr. Bieniek recommended surgery to repair plaintiff's patellar tendon.  *Id.*  On May 29, 2013, Dr. Bieniek performed surgery to repair the patellar tendon of plaintiff's left knee.  (Tr. 16)

### IV.    The ALJ's Decision

In the decision issued on April 4, 2013, the ALJ made the following findings:

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016.

---

cancer."  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited Aug. 19, 2015).

2. Plaintiff has not engaged in substantial gainful activity since April 23, 2011, the alleged onset date.

3. Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine; atrial fibrillation; GERD; obesity; hypertension; anxiety; depression; low back pain with a history of lumbar surgeries with hardware placement; degenerative joint disease of the left elbow; and degenerative joint disease of the bilateral knees.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that plaintiff is limited to unskilled and low-stress work, defined as jobs involving no interaction with the public and no high production demands, expectations, or quotas.

6. Plaintiff is unable to perform any of his past relevant work.

7. Plaintiff was born on September 12, 1963, and was 47 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because plaintiff is not disabled, whether or not plaintiff has transferable job skills.

10. Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from April 23, 2011, through the date of the ALJ's decision.

(Tr. 17–35)

## V. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108

F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."

Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).   "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."   Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2.   "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."   *Moore*, 572 F.3d at 523 (quotation marks and citation omitted).

    In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.   *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002).   This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."   *Buckner*, 646 F.3d at 558 (quotation and citation omitted).   "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'"   *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)).   After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.   *Singh v. Apfel*,

222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [the claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## VI. <u>Discussion</u>

Plaintiff presents only one question for review: Did the ALJ err when he determined that plaintiff has the RFC to perform sedentary work with the additional restriction that he is limited to unskilled and low-stress work, defined as jobs involving no interaction with the public and no high production demands, expectations, or quotas?

### A. <u>Residual Functional Capacity</u>

Plaintiff alleges that the ALJ committed five errors that undermine his determination that he has the RFC to perform sedentary work, with the restrictions elsewhere described: (1) The ALJ erred when he did not give controlling weight to the opinion of plaintiff's treating physician, Dr. Nichols, as presented in the physician's medical source statement. (2) The ALJ erred when he discounted plaintiff's subjective complaints of disabling symptoms. (3) The ALJ erred when he gave little weight to the third-party opinions of plaintiff's brother and girlfriend. (4) The ALJ erred when he discounted plaintiff's credibility in part because he had applied for and received unemployment benefits after his alleged onset date. (5) The ALJ based his determination of plaintiff's RFC on "no evidence at all," particularly where the ALJ failed to discuss plaintiff's list of prescription medications.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). "Because the social

security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### 1. Dr. Nichols's Medical Source Statement

First, plaintiff alleges that the ALJ committed reversible error by not assigning controlling weight to the conclusions Dr. Nichols offered in his medical source statement. (Tr. 32–33) Having examined and treated plaintiff many times over a period of years, Dr. Nichols was a treating physician.

Generally, the Commissioner gives more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. § 419.927(c)(1). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)). An examining physician's opinion, however, neither inherently or automatically has controlling weight and "does not obviate the need to evaluate the record as a whole." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotations and citations omitted).

"An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation marks and citation omitted). Moreover, "[a]n ALJ is entitled to give less weight to the opinion of a treating doctor where the

doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence." *Rosa v. Astrue*, 708 F. Supp. 2d 941, 950 (E.D. Mo. 2010); *see also Davis v. Shalala*, 31 F.3d 753, 756 (8th Cir. 1994); *Loving v. Dep't Health & Human Servs.*, 16 F.3d 967, 971 (8th Cir. 1994). An ALJ may not substitute his own opinions for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate-Fires*, 564 F.3d at 946–47 (ALJs may not "play doctor"). However, an ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). But, of course, an ALJ is not required to discuss in detail every item of evidence. *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).

As the ALJ explained, Dr. Nichols admitted that his opinion (Tr. 638–41) was based on plaintiff's subjective reports of pain. *See Rosa*, 708 F. Supp. 2d at 950. Moreover, Dr. Nichols's own treatment notes and the medical evidence from other sources "throughout the record[] do not support [Dr. Nichols's suggestion of] extreme limitations." (Tr. 32); *Wildman*, 596 F.3d at 964. Because Dr. Nichols's opinion was inconsistent with the medical and other evidence, the ALJ did not err when he did not afford Dr. Nichols's medical source statement controlling weight. *See Goff*, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [an] opinion."). Thus, the ALJ properly discounted Dr. Nichols's conclusions when he determined plaintiff's RFC, so the ALJ did not err.

## 2. <u>Plaintiff's Subjective Complaints</u>

Second, plaintiff claims the ALJ erred when he found that plaintiff's subjective complaints of disabling pain and other symptoms were not fully credible. (Tr. 26) In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth factors an ALJ must consider in evaluating the credibility of a plaintiff's testimony and complaints, in addition to the objective medical evidence. These factors include:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322); *see also Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (explaining that a court is to "defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth" (internal quotation marks and citation omitted)). Moreover, a claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski*, 739 F.2d at 1322.

Acknowledging but wholly misapprehending the ALJ's eight single-spaced pages of well-reasoned analysis—in which the ALJ cited to hundreds of pages of objective medical records and records of plaintiff's subjective complaints, as well as plaintiff's testimony at the hearing—plaintiff avers that the ALJ should have found him fully credible. As *Polaski* and its progeny instruct, however, the ALJ was

entitled to discount plaintiff's credibility provided that he gave good reasons for doing so, which he did.

The ALJ considered, *inter alia*, the following medical and other evidence to determine that plaintiff's subjective complaints of disabling symptoms are not fully credible:  Plaintiff's condition improved after treatment on multiple occasions.  He repeatedly denied suffering chronic pain, and his musculoskeletal and cardiovascular examinations were also repeatedly normal.  As the ALJ explained, plaintiff's extremities, back, hips, and pelvis were noted to be without obvious abnormalities.  He was noted not to be suffering from joint or muscle pain, with a normal range of motion, multiple times.  His posture and weight-bearing capacity were also normal.  Though he is obese, no medical records indicate his obesity increases the severity of his symptoms to such a degree that he cannot ambulate independently.  Additionally, plaintiff repeatedly denied nausea, vomiting, diarrhea, or urinary or fecal incontinence; there is no evidence that he suffers from frequent incontinence, contrary to his testimony.  X-rays of plaintiff's spine, though showing degenerative changes, showed no acute disease on multiple occasions.  Plaintiff's neck was also reported as normal repeatedly, with only intermittent notations of pain or abnormalities.  Though plaintiff has a history of depression and anxiety, he repeatedly and inconsistently denied experiencing symptoms of those conditions, and no evidence in the record shows any treatment for those conditions beyond his prescription for Zoloft.  The ALJ also noted that plaintiff admitted on several occasions that he had not been taking one or more of his prescribed medications, and his treatment since the alleged onset date has been routine and conservative.  (Tr. 26–33)

As the preceding analysis demonstrates, and consistent with *Polaski*, the ALJ properly considered substantial evidence that demonstrates plaintiff's subjective complaints are not fully credible. Therefore, the ALJ's determination that plaintiff is not entirely credible was not error, and the RFC formulated in part on that basis suffers from no defect.

### 3.  Third-Party Statements

Next, plaintiff asserts that the ALJ erred when he afforded little weight to the third-party function reports of plaintiff's brother and girlfriend. An ALJ may properly discount the "[c]orroborating testimony" of a person who has an "interest in the outcome of the case." *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006). An ALJ is also permitted to discount opinions, even those by treating physicians, where such opinions are inconsistent with other substantial evidence in the record. *See Cline*, 771 F.3d at 1103. Here, as *Choate* permits, the ALJ afforded little weight to plaintiff's brother and girlfriend's reports because neither of them are acceptable medical sources and they both have an interest in seeing plaintiff obtain benefits due to their relationship with him. (Tr. 33) In accordance with *Cline*, the ALJ further found their statements were entitled to little weight because their opinions were "simply not consistent with the preponderance of the observations by medical doctors in this case." *Id.* The ALJ therefore did not err when he afforded little weight to the brother and girlfriend's lay assessments, because he explained his reasons for doing so. As such, the ALJ's determination of plaintiff's RFC suffers from no reversible error for his having afforded little weight to those third-party reports.

### 4.  Unemployment Benefits

Among the reasons the ALJ found plaintiff lacked credibility was his admission that he applied for and received unemployment benefits after his alleged onset date. (Tr. 32) "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Johnson*, 240 F.3d at 1148. "[T]he acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability." *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998). "A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work." *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991). "Because his application necessarily indicates that [plaintiff] was able to work, this may be some evidence, though not conclusive, to negate his claim that he was disabled . . . ." *Id.*

Misconstruing *Cox* and *Jernigan*, plaintiff contends that the ALJ could not "automatically" find him less credible based "by itself" on the fact that he applied for and received unemployment benefits. First, consistent with *Cox* and *Jernigan*, the ALJ did not find plaintiff less credible solely because he applied for unemployment benefits. The ALJ in fact considered substantial medical and nonmedical evidence to determine that plaintiff's complaints were not fully credible; the fact that he applied for unemployment benefits was but one such item of evidence. Therefore, the ALJ did not misapply *Cox* and *Jernigan*, because plaintiff's application for unemployment benefits was not used "by itself" to determine his credibility.

Second, *Cox* and *Jernigan* plainly instruct that an ALJ is permitted to discount a claimant's credibility both when he applies for and when he receives

unemployment benefits after his alleged onset date. The ALJ did not discount plaintiff's credibility "automatically" on that basis; he did so only after he considered the very factor that the Eighth Circuit upheld in *Cox* and *Jernigan*: the fact that plaintiff applied for unemployment benefits may be, and here was, one indicator that he is less credible overall. Thus, the ALJ did not err.

### B. Evidence Supporting RFC Determination

Finally, plaintiff contends the ALJ failed to cite any medical or other evidence that reasonably leads to the conclusion that plaintiff has the RFC to perform sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a). In his disability application plaintiff reported that in his past relevant work at Wal-Mart required him to sometimes lift up to ten pounds. (Tr. 243–44) In fact, he had "frequently" lifted objects weighing up to ten pounds when he worked in the Wal-Mart fitting room. *Id.* Thus, the record before the ALJ was uncontested that plaintiff had once been capable of performing, and he did perform, sedentary work. The ALJ then considered the existence and severity of plaintiff's symptoms to determine whether he was presently capable of such performance, ultimately concluding that plaintiff has the RFC to perform sedentary work. (Tr. 24–33)

In reaching the conclusion that plaintiff can perform sedentary work, the ALJ first found that plaintiff's medically determinable impairments could reasonably be

expected to cause his alleged symptoms. (Tr. 26) Plaintiff alleges no error with that determination. Second, however, in evaluating the intensity, persistence, and limiting effects of plaintiff's symptoms, the ALJ found that his symptoms were such that he could still perform sedentary work. (Tr. 26–33) Plaintiff alleges the ALJ erred in evaluating the severity of his symptoms, claiming the ALJ did not cite any evidence that supports his conclusion.

As discussed above, in evaluating the severity of plaintiff's symptoms and making a credibility determination under the *Polaski* factors, the ALJ was obligated to consider the objective medical evidence as well as:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322); *see Smith*, 756 F.3d at 625.

Again, contrary to plaintiff's assertion, the ALJ considered, *inter alia*, the following medical and other evidence to determine that plaintiff is capable of performing sedentary work: Plaintiff's condition improved after treatment on multiple occasions. He repeatedly denied suffering chronic pain, and his musculoskeletal and cardiovascular examinations were also repeatedly normal. As the ALJ explained, plaintiff's extremities, back, hips, and pelvis were noted to be without obvious abnormalities. He was noted not to be suffering from joint or muscle pain, with a normal range of motion, multiple times. His posture and weight-bearing capacity were also normal. Although he is obese, no medical records indicate that his obesity increases the severity of his symptoms to such a

degree that he cannot ambulate independently. Additionally, plaintiff repeatedly denied nausea, vomiting, diarrhea, or urinary or fecal incontinence; there is no evidence that he suffers from frequent incontinence, contrary to his testimony. X-rays of plaintiff's spine, though showing degenerative changes, showed no acute disease on multiple occasions. Plaintiff's neck was also reported as normal repeatedly, with only intermittent notations of pain or abnormalities. Though plaintiff has a history of depression and anxiety, he repeatedly and inconsistently denied experiencing symptoms of those conditions, and no evidence in the record shows any treatment for those conditions beyond his prescription for Zoloft. The ALJ also noted that plaintiff admitted on several occasions that he had not been taking one or more of his prescribed medications, and his treatment since the alleged onset date has been routine and conservative. (Tr. 26–33)

Given those findings, the ALJ determined that plaintiff's "treatment history do[es] not fully support his allegations of the severity of his functional limitations," and, therefore, the ALJ found plaintiff's allegations only "partially credible." (Tr. 30) Recognizing that plaintiff has some significant restrictions, moreover, the ALJ determined that plaintiff's RFC is "relatively restrictive," such that he can perform only sedentary work, "but the evidence does not support a finding that [plaintiff] is precluded from all work." *Id.* Thus, the ALJ cited substantial medical and other evidence to support his conclusion that, even though plaintiff's conditions cause his symptoms, and his symptoms restrict him to only certain less-strenuous classes of work, he has the RFC to perform sedentary work.

Contrary to plaintiff's position, the fact that the ALJ did not explicitly mention plaintiff's list of prescription medications is irrelevant; it did not give rise to any

error in the ALJ's decision. That is so because evidence of plaintiff's medications is present throughout the nearly six hundred pages of medical and other records before the ALJ. Nothing in the opinion suggests that the ALJ failed to notice the consistent references to plaintiff's medications after examining and discussing those records. Rather, the ALJ properly considered the medications, such as when he noted that plaintiff had failed to take his blood pressure medication. (Tr. 26) The ALJ's failure to explicitly mention plaintiff's list of prescription medications was not error, and, even if it were, the error was harmless. *See Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008) (holding that "an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome" (quotation marks and citation omitted)).

In sum, substantial medical and other evidence support the ALJ's conclusion that plaintiff is capable of performing sedentary work. The ALJ did not err in determining plaintiff's RFC.

*****

For the reasons discussed above,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2015.